UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 08-298-JBC

JEFFERY C. CAUDILL, PLAINTIFF,

V.  **MEMORANDUM OPINION AND ORDER**

JOHN SCOTT FELDER, ET AL., DEFENDANTS.

\* \* \* \* \* \* \* \* \* \*

This matter is before the court upon the motions for summary judgment by the defendants Humana Health Plan, Inc., Ashley Curry, Melanie Brady, Angela Gammons (R. 37), and John Scott Felder (R. 38). The court will grant the motions because there is no genuine issue as to any material fact and the defendants are entitled to a judgment as a matter of law.

I. Facts

On June 14, 2007, in Richmond, Kentucky, the plaintiff attempted but was unable to fill a prescription medication for his diabetes. The next morning, he called his insurance company, Humana. A conversation ensued between the plaintiff and Humana employee Ashley Curry. Apparently frustrated with Humana's service and in serious need of his medication, the plaintiff said, "Do you have any idea how many people have went [sic] crazy and killed their co-workers because of having to deal with you people and these computers? I would like to know because I know there has got to be a bunch." He asked, "Are you in Lexington by any chance?"

and "Where is the nearest Humana person I can actually put my hands on?" The plaintiff said to Curry that "the last time I had it out with the damned insurance company, by the time I got done beating on my doctor, they put me in jail for terroristic threatening. And then when I got out, you know, come to find out it wasn't his fault. It was the damned insurance company's. Kind of a nut thing. Now, where did they move to if they are not in Lexington? Are they in Louisville?" The plaintiff asked for the location of the "one that is personally picking on me." Referring to the previous incident with the doctor, the plaintiff said, "I got it in my head that he was trying to cause me some problems so I went out there when he got off work and chased him up through the parking lot with my car. I really wasn't going to run over him but just kind of bump him along, you know what I mean?" He told Curry that for this incident he had "done about 30 days in jail," and asked her, "Where do you live?" and "Where is the nearest place I can connect with you?" He asked multiple times for the physical location of Curry's supervisor, and said to Curry, "If they can't speak to me, then you just need to tell me where they are at [sic]." Referring to Melanie Brady, Curry's supervisor, the plaintiff asked, "Where is she at [sic]?"

    Curry transferred the plaintiff's call to Brady. After a conversation with the plaintiff similar to Curry's conversation with him, Brady transferred the call to another supervisor, Angela Gammons. Even though the plaintiff did not threaten to use a bomb against Humana buildings, as was later rumored, the conversations

2

caused Brady and Gammons to alert Jeff Mosier of Securitas Security Services, Humana's contracted security firm.  Mosier alerted the Richmond police, and the Richmond police alerted the Kentucky State Police.  Trooper John Scott Felder of the Kentucky State Police began to investigate the case.  He spoke with Gammons and Mosier, and understood from those conversations that the Humana employees perceived threats from the plaintiff's language, including a threat to beat Brady with a stick, as well as a physical threat to Humana buildings.  Felder's conversations with Gammons and Mosier included the rumor of a bomb threat.

That same day, Felder sought out the plaintiff at the plaintiff's place of work, Madison Tool and Die, Inc., which is co-located and associated with Blue Grass Armory, a firm that manufactures, among other items, .50 caliber sniper rifles. Felder found the plaintiff at work and legally carrying a loaded handgun.  After locating the plaintiff and asking him to temporarily disarm, which he did, Felder questioned him concerning the alleged threats.  The plaintiff denied making a bomb threat to Humana buildings, but did not deny making a telephone call and having arguments with Humana employees.

Felder left the plaintiff's workplace.  He visited the local county attorney, swore a complaint against the plaintiff, and obtained an arrest warrant signed by Judge William G. Clouse.  The warrant cited the offense of terroristic threatening in the first degree.[1]

---

[1] "A person is guilty of terroristic threatening in the first degree when he or she: (a) [i]ntentionally makes false statements that he or she or another person has

In the late afternoon, Felder, along with another Trooper and a supervisory Lieutenant from the Kentucky State Police, went to the plaintiff's residence to execute the arrest warrant. They entered the home but found the plaintiff outside in the rear. The plaintiff's wife and granddaughter were in the vicinity. The plaintiff was armed with the same loaded handgun with which he was armed earlier in the day when Felder met him at his place of work. The three officers approached the plaintiff to arrest him. The plaintiff did not immediately relinquish his weapon. The plaintiff asked Felder, "[h]ave you lost your fucking mind?" Felder pointed his service pistol at the plaintiff in close proximity to the plaintiff's face. One of the officers said that he "will blow [Felder's] head off," or words to that effect. Felder then subdued the plaintiff by throwing him to the ground and retrieving his handgun.[2] The plaintiff was handcuffed, lifted from the ground, and transported to the Madison County Detention Center, booked, and released the same day. The plaintiff's handgun was not immediately returned to him.

---

placed a weapon of mass destruction on: (1) [t]he real property or any building of any public or private elementary or secondary school, vocational school, or institution of postsecondary education; (2) a school bus or other vehicle owned, operated, or leased by a school; (3) [t]he real property or any building public or private that is the site of an official school-sanctioned function; or (4) [t]he real property or any building owned or leased by a government agency; or (b) [i]ntentionally and without lawful authority, places a counterfeit weapon of mass destruction at any location or on any object specified in paragraph (a) of this subsection." KY. REV. STAT. ANN. 508.075(1) (2010).

[2]Felder recites a different version of the encounter, see R. 38, Ex. D, but the court views the facts in a light most favorable to the plaintiff.

4

After further investigation that found no evidence of a bomb threat, Felder took action to have the charge of terroristic threatening in the first degree, a felony, reduced to terroristic threatening in the third degree,[3] a misdemeanor. On January 4, 2008, the day of the bench trial, the criminal charge against the plaintiff was dismissed because no witnesses appeared for the Commonwealth. On March 25, 2008, the plaintiff's handgun was returned to him. On June 13, 2008, the plaintiff filed suit against Humana Health Plan, Inc., Curry, Brady, Gammons ("Humana defendants"), and Felder for violations of constitutional rights under 42 U.S.C. § 1983, and a variety of torts. *See* R. 1, Ex. 2; R. 37, Ex. A, B, J, M, N; R. 38, Ex. A; R. 41, Attach. 1-8.

## II. Analysis

### A. Qualified Immunity

Felder's conduct during the arrest was objectively reasonable; thus he did not violate the plaintiff's constitutional rights and is entitled to qualified immunity. "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under the doctrine of qualified immunity, government

---

[3]"A person is guilty of terroristic threatening in the third degree when: (a) [h]e threatens to commit any crime likely to result in death or serious physical injury to another person or likely to result in substantial property damage to another person; or (b) [h]e intentionally makes false statements for the purpose of causing evacuation of a building, place of assembly, or facility of public transportation." KY. REV. STAT. ANN. 508.080(1) (2010).

officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harris v. Circleville*, 583 F.3d 356, 364-65 (6th Cir. 2009) (citing *Dominguez v. Correctional Medical Services*, 555 F.3d 543, 549 (6th Cir. 2009) and *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008)). If the facts that the plaintiff has alleged or shown make out a violation of a clearly established constitutional right, then the official whose conduct violated the right does not enjoy qualified immunity. *See Pearson,* 129 S. Ct. at 815-16 (citing Fed. R. Civ. P. 12, 50, 56; *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The plaintiff alleges excessive force on the part of Felder in that, during the arrest at the plaintiff's residence, Felder threw him to the ground and threatened him with a drawn firearm, which Felder placed in close proximity to his face. *See* R. 1, Ex. 2; R. 41.

The right to be free from excessive force under the Fourth Amendment[4] is clearly established. *See Adams v. Metiva*, 31 F.3d 375, 386-87 (6th Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 392-93 (1989)). The right to be free from forceful conduct by law enforcement officers that "shocks the conscience"

---

[4]The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated[.]" U.S. Const. amend. IV.

6

under the Fourteenth Amendment[5] is also clearly established. *See generally County of Sacramento v. Lewis*, 523 U.S. 833 (1998). However, in excessive force cases, "the standards vary significantly according to which amendment applies." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) ("'A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment . . . .'")). Since the standard under the Fourth Amendment is an easier one for the plaintiff to meet, Felder's conduct is analyzed accordingly.

Under the Fourth Amendment, excessive force may be found if Felder's actions were not objectively reasonable under the totality of the circumstances. Rather than with the 20/20 vision of hindsight, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, in light of the facts and circumstances confronting him or her, and without regard to his or her underlying intent or motivation. *See Graham*, 490 U.S. at 396-97 (citing *Terry v. Ohio* at 392 U.S. 1, 20-22 and *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). Relevant considerations in determining the reasonableness of the force used by Felder against the plaintiff are: 1) the severity of the suspected crime for which the plaintiff was being arrested, terroristic threatening in the first degree; 2) Felder's reasonable belief that the plaintiff, armed with a loaded weapon,

---

[5]The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

posed an immediate threat to the safety of police officers and others; and 3) the plaintiff's initial resistance to the arrest. *See id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

"The right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Ibid*. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' *Johnson v. Glick*, 481 F.2d [1028,] 1033 [(6th Cir. 1973)], violates the Fourth Amendment." *Ibid*. As he had seen that the plaintiff was armed earlier in the day, Felder had very good reason to believe that the plaintiff was armed when the officers attempted to execute the arrest warrant. Felder had learned that multiple Humana employees felt that they had received threats of physical violence, that the plaintiff told them that he had been jailed previously for assaulting a doctor, and that the plaintiff had significant access to weapons. In undergoing an assessment of his conduct when making the arrest, Felder enjoys an "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Behind the house, when forced to the ground by Felder, the plaintiff was not yet restrained and had not yet relinquished control of his loaded handgun. Felder's actions were that of a reasonable officer seeking to execute a warrant for the arrest of a man suspected of terroristic threatening in the first degree who had been carrying a loaded weapon earlier that day, and was hesitant to relinquish the same loaded weapon when

8

approached by officers to be arrested. Under the circumstances, Felder's pointing his weapon at the plaintiff was reasonable when the plaintiff would not immediately disarm. A mention to the plaintiff of "blowing [his] face off" by one of the officers may shed light on that officer's intent, but does not amount to excessive force by Felder.

In response to the defendants' motions for summary judgment, the plaintiff makes much of the fact that Felder swore a complaint and obtained an arrest warrant for suspected terroristic threatening in the first degree, rather than the lesser charge of terroristic threatening in the third degree, and that Felder should have understood the mention of a bomb threat to be an unsubstantiated rumor. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). Felder had sufficient evidence to constitute probable cause that the plaintiff committed a crime, and while it is possible that he "reasonably but mistakenly" concluded that probable cause was present for a charge of terroristic threatening in the first degree instead of the third degree, he will "not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (citing *Malley,* 475 U.S. at 344-45). Furthermore, Felder made sure, well before adjudication, that the charge was amended to reflect lack of evidence of a bomb threat.

In the complaint, the plaintiff claims that at the scene of the arrest "his home was invaded" by Felder. However, since Felder had an arrest warrant based on

9

probable cause and reason to believe that the plaintiff was in his own house, *see Payton v. New York*, 445 U.S. 573, 603 (1980), this invasion did not violate the plaintiff's rights under the Fourth Amendment. Finally, the plaintiff argues that the seizure of his handgun upon his arrest, and the length of time it took to get it back from government officials after his case was dismissed, approximately three months, amounts to a deprivation of property. While Felder may have been responsible for seizing the handgun at the time of arrest, there is no evidence that he was the custodian of the handgun while the plaintiff's case was pending, or that he was responsible for returning the handgun to the plaintiff. The general rule that "seized property, other than contraband, should be returned to the rightful owner after the criminal proceedings have terminated," *United States v. Francis*, 646 F.2d 251, 262 (6th Cir. 1981) (citing *United States v. LaFatch*, 565 F.2d 81, 83 (6th Cir. 1977)), was followed in the case. Viewing the facts according to the plaintiff, Felder's actions, whether or not they were those of the model officer, were reasonable under the totality of the circumstances, and did not amount to a violation of the plaintiff's constitutional rights. Thus, Felder enjoys qualified immunity. Alternatively, he is entitled to a judgment as a matter of law because, like the Humana defendants, he is not liable for torts alleged by the plaintiff.

**B. Torts**

In addition to violations of constitutional rights, the plaintiff claims abuse of process, malicious prosecution, defamation of character, intentional infliction of emotional distress, and false imprisonment. *See* R. 1, ex. 2; R. 41. He cannot be

successful on the claims because for each, respectively, the evidence lacks proof of an essential element or shows a defense to liability.

Neither the Humana defendants nor Felder may be held liable for abuse of process because there is no evidence that any of them had an ulterior motive for their actions. *See Raine v. Drasin*, 621 S.W.2d 895, 902 (Ky. 1981). To the extent that they employed legal process at all, they did so for the "purpose for which it was intended by the law to effect," that is, to report and arrest a suspect they believed had committed a crime and posed a danger to the community. *Ibid.* Nor did the defendants perform "a willful act in the use of the process not proper in the regular conduct of the proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citing *Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765 (Ky. Ct. App. 1980) and *Williams v. Central Concrete, Inc.*, 599 S.W.2d 460 (Ky. Ct. App. 1980)). That is, none of them took a step toward the accomplishment of any ulterior motive, a required element of the claim. "In the present action, neither essential element of a cause of action for abuse of process appears to be present and the absence of either is fatal" to the plaintiff's claim. *Id.* at 395.

To win a claim of malicious prosecution, the plaintiff must show that a defendant instituted judicial proceedings with malice and without probable cause, and that those proceedings were terminated in favor of the plaintiff and caused the plaintiff to suffer damages. *See Raine*, 621 S.W.2d at 899. "The burden in a malicious prosecution action is on the plaintiff to prove lack of probable cause, and the probable cause issue is a question for the court to decide." *Collins v. Williams*,

10 S.W.3d 493, 496 (Ky. Ct. App. 1999) (citing *Prewitt v. Sexton*, 777 S.W.2d 891, 894-95 (Ky. 1989)). Each defendant "need only have 'such reasonable grounds to believe a crime had been committed that he was justified in invoking the process of law to have that question judicially determined.'" *Bertram v. Fed. Express Corp.*, 2008 WL 170063, at *3, U.S. Dist. LEXIS 3744, at *8-9 (W.D. Ky. 2008) (quoting *Reid v. True*, 302 S.W.2d 846, 848 (Ky. 1957)). Among the facts known by the defendants, *see Hudson v. Nolen*, 135 S.W. 414, 415-16 (Ky. 1911), were that the plaintiff said on the telephone that he had previously attempted violence toward someone in the medical community, had been jailed for it, wanted to know where he could find a Humana employee to "get his hands on," and repeatedly asked about locations of Humana employees and buildings. In considering the threat, Felder had heard a rumor of a bomb threat from Mosier and Gammons, knew that the plaintiff had significant access to weapons, and was able to personally observe the plaintiff's attitude and demeanor upon a visit to the plaintiff's workplace. While he did not have trial-ready evidence, "within his knowledge" he had "facts and circumstances" of which he had "reasonably trustworthy information," and which were "sufficient to warrant a prudent [person] in believing" that the plaintiff had committed terroristic threatening. *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). Also, the fact that Felder "consulted the county attorney," though not unusual, "tends to show good faith and diligence on his part." *Reid* 302 S.W.2d at 848. To the extent they instituted judicial proceedings, each of the defendants had

probable cause to believe a crime had been committed.  Furthermore, since the plaintiff's criminal case was dismissed summarily when witnesses for the prosecution did not appear, there was no favorable termination of the proceedings on the merits of the action.  The outcome did not reflect on innocence or lack of responsibility for the alleged misconduct, as required by Kentucky law to support a claim of malicious prosecution.  *See Davidson v. Castner-Knott Dry Goods Co.,* 202 S.W.3d 597, 605 (Ky. Ct. App. 2006); *Alcorn v. Gordon*, 762 S.W.2d 809, 811-13 (Ky. 1988).  Even when viewed in the light most favorable to him, the evidence cannot support the plaintiff's claim for malicious prosecution.

To recover for defamation, the plaintiff must establish defamatory language about the plaintiff which is published and causes injury to reputation.  *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (citing *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981)).  However, the defendants in this case enjoy the privilege of communications made in the institution of a judicial proceeding contemplated in good faith and under serious consideration.  *See General Electric Comp. v. Sargent & Lundy*, 916 F.2d 1119, 1126-27 (6th Cir. 1990).  The privilege protects one who makes such communications from liability for defamation.[6]  *See ibid*.  The Humana defendants

---

[6]"The doctrine of privileged communications rests upon public policy 'which looks to the free and unfettered administration of justice, though, as an incidental result, it may, in some instances, afford an immunity to the evil-disposed and malignant slanderer.'" *General Electric*, 916 F.2d at 1126 (quoting *Schmitt v. Mann*, 163 S.W.2d at 281, 284 (Ky. 1942)).

reported what they perceived to be threats to security personnel who, in turn, reported the threats to law enforcement authorities. There is no evidence that communications were made to injure the plaintiff's reputation or for any other purpose than a judicial proceeding – the arrest and prosecution of the plaintiff. Thus, the plaintiff cannot recover for defamation based on the communications of those seeking to report, investigate, or prosecute the plaintiff for the suspected crime of terroristic threatening.

The plaintiff also seeks to recover for intentional infliction of emotional distress. To be successful, he must show, among other elements, that a defendant's conduct was "outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." *Stringer,* 151 S.W.3d at 788) (citing *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990)). The court plays a "substantial screening role on the questions of extreme and outrageous conduct and the severity of the harm," Restatement (Third) of Torts § 45 cmt. f (Draft No. 5) (2007), and "'[i]t is for the court to determine . . . whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'" *Stringer*, 151 S.W.3d at 788-89 (quoting Restatement (Second) of Torts § 46(1) cmt. h (1965)). In simply reporting to contracted security what they perceived as physical threats by a customer, the conduct of each Humana defendant was not outrageous or intolerable, and does not offend against any generally accepted standard. Similarly, given the perceived threat posed by the plaintiff, Felder's actions were those of a reasonable officer under the

14

circumstances; they did not offend against generally accepted standards of decency and morality. "[N]ot every upset plaintiff can recover for emotional distress." *First and Farmers Bank of Somerset, Inc. v. Henderson*, 763 S.W.2d 137, 143 (Ky. Ct. App. 1988) (citing *Zurich Insurance Company v. Mitchell*, 712 S.W.2d 340 (Ky. 1986)). Thus, the defendants' conduct was not extreme and outrageous and the harm not sufficiently severe to warrant liability.

Finally, the plaintiff seeks to recover for false imprisonment. He must establish that he was detained and that the detention was unlawful. *See Pennington v. Dollar Tree Stores, Inc.*, 28 Fed. Appx. 482, 488 (6th Cir. 2002) (citing *Wal-Mart Stores, Inc. v. Mitchell*, 877 S.W.2d 616, 617 (Ky. Ct. App. 1994)). The Humana defendants did not detain the plaintiff, or even specifically request that he be detained, but merely alerted their company's security firm's representative, Jeff Mosier, to one who they believed was making threats. Mosier then alerted law enforcement. Felder detained the plaintiff, but the detention was lawful: Felder was a Kentucky State Trooper who had a warrant, supported by probable cause that a crime was committed, to arrest the plaintiff. Of the defendants in the case, only Felder detained the plaintiff, and because that detention was lawful, the plaintiff cannot recover for false imprisonment.

Viewing the evidence in the light most favorable to the plaintiff, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), there is no genuine issue as to any material fact in any of the plaintiff's claims. Felder is entitled to qualified immunity, and because the plaintiff has failed to make

a sufficient showing on at least one essential element or is precluded from recovery by a valid defense concerning each of his claims, the defendants are entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  Accordingly,

**IT IS ORDERED** that the motions for summary judgment by the defendants Humana Health Plan, Inc., Ashley Curry, Melanie Brady, Angela Gammons (R. 37), and John Scott Felder (R. 38) are **GRANTED**, and Judgment is entered contemporaneously with this order.

**IT IS FURTHER ORDERED** that the pre-trial conference scheduled on March 10, 2010, and the jury trial scheduled on April 26, 2010, are **CANCELED**.


Signed on  January 28, 2010

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY